**Roger WEEDEN, Plaintiff,**

v.

**MINNESOTA MINING AND MANUFACTURING COMPANY, et al., Defendants.**

**No. 1:90-cv-1379-RHH.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 10, 1991.

William E. Sumner, David A. Webster, Sumner & Hewes, Atlanta, Ga., for plaintiff.

John R. Crenshaw and Timothy W. Johnson, Atlanta, Ga., for defendants.

## ORDER

ROBERT H. HALL, Jr., District Judge.

This is a case arising under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (the "ADEA"), the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") and the laws of the State of Georgia. Jurisdiction is vested with this Court pursuant to 28 U.S.C. § 1331, as well as 29 U.S.C. §§ 1132(e) and 626(c).

This case is currently before the Court on Defendants' Motion for Summary Judgment [22-1]. The Court GRANTS IN PART and DENIES IN PART Defendants' Motion. Specifically, the Court GRANTS as unopposed Defendants' Motion as regards Counts I and II of Plaintiff's Complaint, and DENIES Defendants' Motion as regards Count III of Plaintiff's Complaint.

## BACKGROUND

Plaintiff Roger Weeden was employed by Defendant Minnesota Mining and Manufacturing Company ("3M") from 1955 to 1979, during which time he filled various positions in sales, sales management, and executive management for the company. During this time, Plaintiff participated in 3M's Employee Retirement Income Plan (the "3M Plan").

In 1955, 3M acquired Prehler, which since 1935 had served as a distributer of 3M products. Thereafter, 3M continued to operate Prehler as a wholly owned subsidiary of 3M. However, in 1978, 3M sold Prehler to Mr. F.A. (Jim) Blankenbaker. Following 3M's sale of Prehler, in 1979, Plaintiff left his employment with 3M to serve as Prehler's Southeast General Manager in Atlanta, Georgia. At the time of his move from 3M to Prehler, Plaintiff signed a form authorizing the transfer of his accrued pension benefits from the 3M Plan to a defined benefit plan maintained by Prehler (the "Prehler Plan").

The 3M Plan, by its terms, provides a retirement benefit based on years of service with, as well as compensation earned from, 3M or another employer that has adopted the 3M Plan. The terms of the 3M Plan do not, however, permit a participant to receive a benefit based upon service and compensation with respect to an employer that has not adopted the 3M Plan. During the period that Plaintiff worked for Prehler, Prehler made no contributions to the 3M Plan and never adopted the 3M Plan on behalf of its employees. Moreover, in 1982, Prehler terminated its own Plan.

In November, 1987, Prehler went out of business. At that time, Plaintiff received benefits accrued from his 1955–1979 employment with 3M, which had been transferred to the Prehler Plan, in the form of a lump sum distribution from the Prehler Plan.

Following Prehler's going out of business, Plaintiff contacted various individuals at 3M to inquire about suitable work opportunities. Finally, in September, 1988, Plaintiff was reemployed by 3M to fill an administrative position. However, Plaintiff's prior experience with 3M and Prehler had been in the areas of sales and general management, positions which he preferred over administration. Thus, upon returning to work for 3M in administration, Plaintiff inquired about possible other positions with 3M better suited to his prior experience and qualifications.

At all times relevant to this lawsuit, 3M employed a Job Preference System ("JPS") in order to aid employees seeking transfer to a different position within the company, as well as 3M managers seeking to hire for particular company departments. In conjunction with the JPS, when a 3M employee is interested in transferring to a different position, he or she completes a job preference form indicating the positions for which the employee is qualified and in which the employee is interested. These forms are kept on file by the JPS. Then, when a 3M manager of a particular department is interested in hiring an individual to fill a certain position, the manager contacts the JPS and is given the files of those employees who have indicated an interest in and qualification for the various job descriptions suited to the particular position for which the manager is hiring. If the manager sees a file which interests him, the manager then may contact the employee directly to pursue further discussions.

Upon his return to 3M in 1988, Plaintiff immediately sought to transfer to a position commensurate with his training, experience and abilities, all of which lay in the area of sales, sales management, and general management. Plaintiff accordingly completed a job preference form indicating his areas of preference and qualification. However, throughout the following year, and presumably through the present, Plaintiff has received no response and has never been contacted by any 3M manager seeking to hire in any of his indicated areas of interest. At the time of his reemployment with 3M, Plaintiff was 59 years old.

On June 27, 1990, Plaintiff commenced the present lawsuit against 3M and the 3M Plan. In Count I of his Complaint, Plaintiff alleges Defendants' failure to pay him accrued employment benefits in violation of ERISA. Specifically, Plaintiff contends that, contrary to the interpretation of the 3M Plan given by the 3M Plan's Director of Benefits, Plaintiff is entitled to pension credit under the 3M Plan for the time during which he was employed at Prehler, on the grounds that Prehler was allegedly an "alter ego" of 3M. In Count II of his Complaint, Plaintiff alleges that, in light of the alleged "alter ego" relationship between 3M and Prehler, Plaintiff is entitled to reimbursement from 3M for certain wages and severance benefits which were not paid to him by Prehler after Prehler went out of business. Finally, in Count III of his Complaint, Plaintiff alleges that 3M violated the ADEA by refusing to consider Plaintiff for suitable employment because of his age.

Currently, Defendants have filed a Motion for Summary Judgment with regard to all of Plaintiff's claims. In responding to Defendants' Motion, Plaintiff does not oppose the entry of summary judgment in Defendants' favor as regards Counts I and II of his Complaint. Plaintiff does, however, oppose Defendants' Motion as regards Count III, his ADEA claim. Thus, the only issue currently before the Court is Plaintiff's ADEA claim.

## DISCUSSION

I. Standard of Review for Summary Judgment

This Court will grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In cases where the movant is the defendant, that party must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of her or his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). Where, as here, the movant is the plaintiff, that party must demonstrate the absence of an issue of material fact with regard to *every* element essential to his or her claim. *Id.* The movant's burden is "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* However, it is not enough in most situations for the movant merely to point out to the court this absence of evidence. *Id.* 477 U.S. at 323, 106 S.Ct. at 2552; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604,

608 (11th Cir.1991). Rather, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)).

Only after the movant meets its initial burden does any obligation on the part of the nonmovant arise. *Id.; Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Clark,* 929 F.2d at 608. Nevertheless, once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

All evidence and factual inferences should be viewed in the light most favorable to the nonmoving party. *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). An issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element essential to his or her case so as to create a *genuine* issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Rollins,* 833 F.2d at 1528.

## II. Application

■ As in other cases of discrimination, an action under the ADEA is a three-step process. First, the plaintiff must establish a prima facie case of age discrimination. *Verbraeken v. Westinghouse Electric Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989), *cert. dismissed,* 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 1012 (1990); *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). The plaintiff's presentation of a prima facie case raises a rebuttable inference of discrimination and shifts the burden to the employer to articulate a legitimate nondiscriminatory reason for adversely treating the plaintiff. *Verbraeken,* 881 F.2d at 1045; *Carter,* 870 F.2d at 584. Upon such a showing by the defendant, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the reasons articulated by the defendant are pretextual and that the real reason for plaintiff's termination was age discrimination. *Verbraeken,* 881 F.2d at 1045; *Carter,* 870 F.2d at 584.

■ In the present case, Defendants base their Motion for Summary Judgment with regard to Count III on their contention that Plaintiff has failed to establish a prima facie case of age discrimination. A plaintiff can establish a prima facie case through one of three commonly accepted means: by presenting direct evidence of discriminatory intent, by meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[1] or through statistical proof. *Verbraeken,* 881 F.2d at 1045; *Carter,* 870 F.2d at 581. "Whether a prima facie case of discrimination has been shown in any given situation is essentially a factual ques-

---

**1.** The *McDonnell Douglas* four-pronged test is applicable in ADEA cases. *Reynolds v. CLP*   *Corp.,* 812 F.2d 671, 674–75 (11th Cir.1987).

tion. The inquiry is whether an ordinary person could reasonably infer discrimination from the facts shown if those facts remain unrebutted." *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1443 (11th Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). Both the Supreme Court and the Eleventh Circuit have repeatedly eschewed an overly strict formulation of the four elements of the prima facie case, especially in age discrimination cases. *See Carter*, 870 F.2d at 583 and n. 12 ("The Supreme Court has stressed that the *McDonnell* test was not intended to be a rigid or ritualistic test of disparate treatment.") (citing *U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1982)).

In the instant case, Defendants contend that Plaintiff has failed under all of the above methods to establish a prima facie case. In responding to Defendants' Motion, Plaintiff contends that he has established or will establish a prima facie case using all three methods. First, Plaintiff contends that in fact he has met the four-pronged *McDonnell Douglas* test, and further that he has presented direct evidence of discrimination. Second, Plaintiff contends that he will, pending its acquisition through discovery, present statistical proof establishing a prima facie case of age discrimination.

### A. *McDonnell Douglas test for discrimination*

■ Under the *McDonnell Douglas* test and its progeny, an ADEA plaintiff makes out a prima facie case by meeting the following four requirements: (1) the plaintiff must belong to the protected group consisting of employees between the ages of forty and seventy; (2) plaintiff's status as an employee must be adversely affected; (3) plaintiff must be replaced by someone outside the protected group; and (4) plaintiff must be qualified for the job denied him or her. *Verbraeken*, 881 F.2d at 1045; *Carter*, 870 F.2d at 582. *See also, Stamey v. Southern Bell Telephone & Telegraph Co.*, 859 F.2d 855, 859 (11th Cir.1988), *cert. denied*, 490 U.S. 1116, 109 S.Ct. 3178, 104

L.Ed.2d 1040 (1989); *Ramsey v. Chrysler First, Inc.*, 861 F.2d 1541 (11th Cir.1988).

■ In arguing that Plaintiff in the instant case has failed to establish a prima facie case under the *McDonnell Douglas* scheme, Defendants do not dispute that Plaintiff meets the first criteria, that is, that Plaintiff is a member of the age group protected by the ADEA. However, Defendants contend that Plaintiff has failed to satisfy the remaining three criteria. Specifically, Defendants argue that Plaintiff has presented no evidence regarding any specific job opportunities for which he expressly applied and was rejected, and which were awarded to younger persons. Defendants also argue that Plaintiff has presented no evidence indicating that he was qualified for any specific positions sought.

Adequate discussion of this issue requires a precise understanding of the 3M JPS under which Plaintiff expressed his interest in seeking alternative job opportunities with 3M. Defendants in their Motion provide a concise overview of how the JPS operates. According to Defendants:

> The mechanics of the JPS system allowed employees to indicate up to three areas of job interest on a computer form. The data was then entered into a computer at 3M. Then, for example, if a manager had an opening and the manager wanted to search for candidates, the manager could request a "search" for candidates interested in the job code in question. The "search" would produce the names of candidates whose current jobs were close to the range or level of the job in question.

Brief in Support of Defendants' Motion for Summary Judgment, pp. 52–3. Plaintiff filled out a job preference form in May, 1989. Throughout the following year, and presumably through the present, Plaintiff has received no inquiries regarding possible placement. Presently, Plaintiff contends that this total lack of response indicates that 3M refused to consider him for such placement due to his age, and thus discriminated against him on that basis in violation of the ADEA.

Defendants essentially base their argument for summary judgment upon the fact that throughout this lawsuit, and throughout his deposition, Plaintiff was and continues to be unable to specify: (1) any particular employment positions for which he applied; (2) which furthermore were awarded to a younger person; and (3) for which Plaintiff was qualified. Thus, Defendants base their argument upon their contention that since Plaintiff is unable to identify *specific* jobs for which he was qualified, applied and was rejected, Plaintiff cannot satisfy the requirements of *McDonnell Douglas.*

Nevertheless, the Court agrees with Plaintiff that to so strictly apply the *McDonnell Douglas* test to the present case would essentially preclude Plaintiff, and others participating in 3M's JPS, from ever asserting charges of discrimination in conjunction with internal placement decisions. Under Defendants' reading of *McDonnell Douglas*, Plaintiff would never be able to make out a prima facie case, given the structure of the JPS, which structure, notably, was presumably fashioned by 3M itself, as the sponsor of the program. Under the 3M JPS, Defendant in fact did not—*could* not—demonstrate his qualification and application for a *specific* job opening. Rather, Plaintiff·was limited by the JPS itself to merely expressing his interest in and qualification for any one of many general job description categories provided on the job preference form.

A case directly on point is *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir.1984). In *Carmichael*, the plaintiff, a black man, applied for work with the defendant, a family-run business engaged in the making and repair of saws. Upon being told that there were no positions available, the plaintiff told the defendant that he needed work. As a result, the defendant agreed to hire the plaintiff as a part-time janitor and stockman, with the understanding that the plaintiff would be given a full-time position when one became available. Eventually, the plaintiff was given a full-time position in the repair shop, where he was paid the minimum wage applicable at the time, and received a raise approximately every six months. After having been in the defendants' employ for approximately one year, the Plaintiff filed a charge of racial discrimination against the defendants with the Equal Employment Opportunity Commission ("EEOC"). After receiving his right-to-sue letter from the EEOC, the plaintiff filed a lawsuit against the defendants alleging their discrimination against him on the basis of race in violation of Title VII.[2]

In his complaint, the plaintiff in *Carmichael* alleged that although he had expressed an interest in receiving a promotion within the company, that is, to a sales position or, apparently, any more desirable position which became available, the defendants had refused to consider him for such positions on the basis of race, but rather had during the same time awarded at least two such positions to white men who had also applied. The trial court in *Carmichael* found, among other things, that due to the fact that the plaintiff had merely informally requested promotion within the company, the plaintiff had failed to establish a prima facie case under *McDonnell Douglas* due to his resulting inability to specify particular jobs for which he was qualified, expressly applied, and was rejected in favor of individuals not protected by Title VII. Thus, the trial court concluded that due to the plaintiff's failure to demonstrate that he was "refused" an "available" job, the plaintiff had failed to establish a prima facie case.

The Eleventh Circuit, however, rejected the trial court's findings on this issue, stating:

> The defendant did not advertise its job openings. Carmichael could not be expected to ask for a sales position when he did not know one was available.... In these circumstances, Carmichael was not required to do more than indicate as best he could that he would take any available job.... [T]he plaintiff was not

**2.** Although *Carmichael* involves a claim of *racial* discrimination rather than *age* discrimination, the analysis under Title VII is essentially the same.

required to ask specifically for that job when he did not know about it and where there was no formal mechanism for expressing his interest.

738 F.2d at 1132–33. Thus, the Court in *Carmichael* concluded:

The defendant used no formal procedures for posting notice of available promotions or for determining who would be offered the promotion. Instead, the company relied on "word of mouth" and informal review procedures. We have recognized that such subjective procedures can lead to racial discrimination, both because important information may be available only to whites and because such procedures place no check on individual biases. For this reason we have held that "[t]he failure to establish 'fixed or reasonably objective standards and procedures for hiring' is a discriminatory practice."

To require this plaintiff to demonstrate an explicit expression of interest in specific jobs would also be at odds with the purposes of the prima facie case in analyzing evidence. The prima facie case raises a presumption of discrimination because it eliminates the most common reasons for rejecting a job applicant: a lack of qualifications and a lack of an available job. The paradigmatic prima facie case, described in *McDonnell Douglas*, requires the plaintiff to prove that he "applied for" a job to eliminate another obvious nondiscriminatory reason: that the plaintiff was not offered the job because the company did not know he was interested. *McDonnell Douglas* "align[s] closely the prima facie case with proof of elements within the plaintiff's own objective knowledge." By showing that he applied, the plaintiff shows that the employer knew he was interested in the job. But when there is no formal notice of the job's availability, the plaintiff may have no means, within his own knowledge, of showing whether the employer considered him or not. Furthermore, *when an employer uses such informal methods it has a duty to consider all those who might reasonably be interested, as well as those who*

*have learned of the job opening and expressed an interest.*

Accordingly, *a plaintiff makes out a prima facie case—that is, he creates a presumption of discrimination and forces the employer to articulate legitimate reasons for his rejection—as long as he establishes that the company had some reason or duty to consider him for the post. The employer cannot avoid a Title VII violation by showing that it incorrectly assumed that the plaintiff was uninterested in the job. When the plaintiff had no notice of or opportunity to apply for the job, such a reason for rejection is "legally insufficient and illegitimate."*

*Id.* at 1133–34 (citations and footnote omitted) (emphasis added).

The Court agrees with Plaintiff that the decision of the Court in *Carmichael* precludes the entry of summary judgment in the instant case. In arguing that *Carmichael* does not so preclude summary judgment, 3M contends that according to the JPS, 3M's hiring managers were under no *duty* to consider Plaintiff for available positions. Rather, 3M contends that its hiring managers had the *option* of utilizing the JPS system *if they so chose*. If not, they were free to hire from other sources and through any other methods available.

Plaintiff, however, contends that at the time of his application to the JPS system, it was represented to him that the JPS system was the *exclusive* method through which 3M hiring managers were to fill vacancies in the various departments. Here, Plaintiff points to the employee information sheet given him at the time of his application to the JPS. This information sheet indisputably does not specifically address whether or not the managers are *required* to utilize the JPS. Rather, the information sheet merely characterizes the workings of the JPS thus:

3) When a job opening occurs, the computer will identify individuals who have nominated themselves for such a job and whose qualifications appear to match those needed.

4) Files of those employees who appear to be qualified will be made available to the supervisor or manager conducting the search.

Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 23. Given the lack of specificity in the information sheet, the Court finds that Plaintiff could reasonably have believed that the JPS constituted the exclusive method by which 3M filled vacancies in its various departments. As a result, the Court finds that in filling out and submitting a job preference form, and in submitting updated forms periodically within the time period in question, Plaintiff indeed indicated to the best of his ability his interest in alternative placement within 3M. As was the case in *Carmichael,* this Court can expect no more.

The present case, as *Carmichael,* presents a situation in which Plaintiff, due to the structure of the JPS itself, necessarily *could not* apply for specific jobs, but rather was limited to merely expressing an interest in several general job description areas, then waiting to hear, from 3M, if any related job positions had become available. Such a system provides Plaintiff with no way to check whether or not he is being actively considered for alternative placement. Plaintiff here, as in *Carmichael,* thus is provided with no method by which he may demonstrate that he applied and was rejected for any *specific* jobs. Thus, application of Defendants' strict interpretation of *McDonnell Douglas* would essentially foreclose Plaintiff's ever being able to establish a prima facie case. As was the case in *Carmichael,* this Court finds such a strict application of *McDonnell Douglas* to be both unjust and undesirable. Moreover, the Court finds that the JPS utilized by 3M is just that type of discretionary and informal hiring practice that the Court in *Carmichael* sought to subject to the requirements of the ADEA. Thus, the Court finds summary judgment to be inappropriate in the instant case with regard to Plaintiff's ADEA claim.

### B. *Other Considerations*

█ It is noteworthy that Defendants in their Motion also attempt to apply 29 U.S.C. § 626(d)(1) to the facts of this case in order to suggest that Plaintiff has not established a "present violation" of the ADEA. In pertinent part, 29 U.S.C. § 626(d)(1) provides:

No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such charge shall be filed—

(1) within 180 days after the alleged unlawful employment practice occurred; . . .

Here, Defendants correctly argue that only matters which were the proper subject of the required EEOC charge may be considered by this Court. Defendants are furthermore correct in arguing that as a result, allegations of discriminatory conduct occurring outside the 180 day filing period may not properly be considered by this Court. However, although Defendants' argument is somewhat less than clear on this point, Defendants apparently misconstrue 29 U.S.C. § 626(d)(1) by arguing that both the alleged discriminatory *act* (3M's refusal to consider Plaintiff for available positions) and all *proof* of discrimination (statements made by other 3M employees, etc.) had to occur within the 180 day filing period in order to satisfy the "present violation" requirement. Defendants' interpretation of § 626(d)(1) thus essentially transforms the 180 day filing requirement into one including a limitation of the time period concerning which a Title VII plaintiff may garner evidence of discrimination.

The basic purpose of the filing requirement of § 626(d)(1) "is to provide the [EEOC] with sufficient information so that it may notify prospective defendants and to provide the [EEOC] with an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation." HR Conf.Rep. No. 950, 95th Cong., 2d Sess., *reprinted in* (1978) U.S.Code Cong.Admin.News 504, 528, 534. The 180 day rule is not intended, as Defendants would maintain, to circumscribe a plaintiff's amassing of *evidence* of discrimination. In the present case, it is undisputed

that Plaintiff's job preference form was on file with the JPS within the 180 day filing period. It is also undisputed that within this 180 day period, Plaintiff received no response from 3M regarding his application. Thus, Plaintiff, in alleging 3M's discriminatory failure to consider him for available positions, clearly alleges a *discriminatory act* falling within the 180 day filing period. The fact that some of his supporting *evidence*, in the form of statements made by other 3M employees, etc., occurred prior to the 180 day period is immaterial. Thus, the Court finds Defendants' argument with regard to the 180 day filing period to be without merit and therefore as not justifying the entry of summary judgment with regard to this claim.

As stated before, this Court finds that Plaintiff has sufficiently demonstrated the existence of an issue of material fact with regard to whether he in fact notified 3M of his interest in alternative placement to the best of his ability, as well as whether 3M was under a duty to consider Plaintiff for available positions. This is all that is required of a Title VII, and, by analogy, an ADEA, plaintiff[3] by *McDonnell Douglas,* as applied more liberally by the Court in *Carmichael* to highly employer-discretionary situations such as the instant one. Moreover, the Court finds Defendants' ar-

gument with regard to the 180 day rule to be unpersuasive. Thus, the Court concludes that summary judgment is inappropriate in the instant case with regard to Plaintiff's ADEA claim.

As a result, the Court need not consider Plaintiff's alternative arguments that he has established a prima facie case through the presentation of direct evidence of discrimination, and that he will, pending its acquisition through discovery, present statistical proof so as to establish a prima facie case on that basis.

### CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment [22–1]. Specifically, the Court GRANTS as unopposed Defendants' Motion as regards Counts I and II of Plaintiff's Complaint, and DENIES Defendants' Motion as regards Count III of Plaintiff's Complaint.

So ORDERED.

---

**3.** As stated before, the Court's analysis of cases asserted under Title VII and the ADEA is essen-

tially the same. *See Verbraeken,* 881 F.2d at 1045; *Carter,* 870 F.2d at 581–84.